DVORACEK *v.* GOLDSTEIN.

1. SALES—BREACH OF WARRANTY—HORSES—EVIDENCE.
    In action based on breach of warranty in the sale of a team of horses, claim that one of the horses was an inherently dangerous animal and had an unruly temper *held*, supported by competent testimony.

2. EVIDENCE—COMMON KNOWLEDGE—ANIMALS—STALLIONS—HALF-GELTS.
    It is a matter of common knowledge among persons who handle horses that stallions and half-gelts are, in general, more fractious and unruly than ordinary work horses.

3. SALES—BREACH OF WARRANTY—HORSES—FINDING OF JURY—EVIDENCE.
    In action for breach of warranty in the sale of a team of horses, finding of jury that there was a warranty by defendant as to gentleness and tractability, breach thereof by defendant and nonacceptance after a trial of the horses and that plain-

tiff relied on the skill and judgment of defendant in considering the nature of the horses was supported by competent testimony (2 Comp. Laws 1929, §§ 9451, 9454).

4. SAME—BREACH OF WARRANTY—FRACTIOUS HORSE.
   In action for breach of warranty as to horses purchased from defendant, which had injured plaintiff shortly after his purchase, record *held*, to be without testimony that plaintiff was guilty of ill conduct causing one of the horses to be fractious on the occasion in question.

5. DAMAGES—PERSONAL INJURIES—BREACH OF WARRANTY AS TO HORSES.
   Verdict of $2,500, as reduced from $3,500 by remittitur, was justified under evidence presented in action by plaintiff who sustained fractured bones, dislocated shoulder, lacerations and shock because of fractiousness of horse which defendant had warranted as being gentle and quiet in harness.

6. SAME—HORSE DEALER'S BREACH OF EXPRESS WARRANTY—PERSONAL INJURIES—MEASURE OF DAMAGES.
   In action for damages resulting from horse dealer's breach of express warranty, damages are not assessed under the usual rule of the difference between the value of the horse as sold and its value had the warranty been true, but plaintiff is entitled to recover for personal injuries proximately resulting from the breach.

7. APPEAL AND ERROR—VERDICT—EVIDENCE—BREACH OF WARRANTY AS TO HORSE.
   Verdict for plaintiff farmer in action for breach of warranty as to nature of horses by defendant horse dealer *held*, sustained by competent evidence not against the great weight thereof.

Appeal from Menominee; Bell (Frank A.), J. Submitted April 6, 1945. (Docket No. 74, Calendar No. 42,974.) Decided June 4, 1945.

Case by Emil Dvoracek against Sam Goldstein for personal injuries and loss of profits sustained when injured by a falsely warranted horse. Verdict and judgment for plaintiff. Remittitur filed. Defendant appeals. Affirmed.

*Doyle & Doyle,* for plaintiff.

*Michael J. Anuta (John J. O'Hara,* of counsel), for defendant.

REID, J. This action is brought upon claimed breach of warranty in the sale of a team of horses by defendant to plaintiff. From judgment for plaintiff, defendant appeals.

Verdict by the jury was rendered in the sum of $3,500 in favor of plaintiff. On August 4, 1944, the trial court ordered that a motion for a new trial be granted unless plaintiff should within 10 days remit all of the verdict in excess of $2,500. On August 5, 1944, plaintiff filed his remittitur of $1,000 and prayed judgment in the sum of $2,500. Judgment for plaintiff was rendered accordingly.

Defendant raises the question on this appeal whether the plaintiff bought the team of horses upon trial, relying on his own skill and judgment and not upon the skill and judgment of the defendant as to the kind of team of horses involved in the transaction. Defendant further claims acceptance by the plaintiff of the team of horses after trial of the team and that there survived no implied warranty after acceptance by the plaintiff. Defendant claims plaintiff was "guilty of contributory negligence as a matter of law" respecting the causation of the runaway by the team and actions by the team for which damages are sought by plaintiff. Defendant further claims that the verdict was punitive, excessive and without sufficient testimony to prove loss of crops and income claimed by plaintiff resultant upon plaintiff's disability caused by the accident, that the damages claimed were indirect, and that the verdict was against the great weight of the evidence.

Plaintiff claims that when he purchased the team of horses defendant warranted and represented the horses to be sound, kind and true, gentle and quiet in harness, and fit and proper for use as a domestic team on plaintiff's farm. The declaration contained a second count alleging substantially that one of the team of horses was half-gelt. On the trial plaintiff discontinued the second count and proceeded at the trial on the first count. It seems that his claim that the horse in question was half-gelt was not abandoned but relied upon under the allegations of the first count as part of the evidence showing the fractiousness of that horse.

There was competent testimony from which the jury could find the following facts:

That plaintiff is a farmer having 220 acres, of which 82 are under cultivation, in Menominee county, on which he resides, and that the cultivation of the 82 acres in question is carried on by himself, his wife and an eight-year-old daughter, with part time help.

That defendant is about 72 years of age and has been dealing in horses and other livestock as a business for 55 years.

That plaintiff had a horse and asked Goldstein to sell him one to make a team, but Goldstein persuaded him to buy the team in question and trade in the horse that plaintiff then had; that plaintiff asked what kind of team it was and defendant replied, "Well, the team is O.K. I can guarantee the team any time you want to," and referring to whether the horses would pull the kind of farm machinery required, "It is my business to find out them things before I sell the horses." That plaintiff asked defendant, "How about it? Are you sure they won't kick, bite or run away?" and told defendant that he had a little girl at home who goes around the

farm and that he didn't want to see his daughter get hurt; that defendant replied, "You don't have to be afraid at all. Where the horses come from they have a girl eight years old. She drives the horses right out in the field," and that defendant further said, "I will let you have the team for 30 whole days. You can try them out in that 30 days and if you aren't satisfied in any way, it don't make any difference to me, in any way at all, I will just take the horses back."

That the foregoing negotiations occurred around June 19, 1943; and that defendant brought the team to plaintiff's farm on June 25 or 26, 1943. That the next day after the team was brought to plaintiff's farm plaintiff put a harness on them to try them out. When plaintiff started out every time, it didn't make any difference where to, the horse called Doc and spoken of as half-gelt was kind of fidgety. When plaintiff said "whoa" Doc would never stand still but would always take a few steps or throw his body around, turn his head, pretty soon foam would be sticking out of his mouth, and for a while when he got in that kind of condition he used to roll his eyes around. That the second time (July 3d) defendant came to plaintiff's farm, plaintiff said to him:

"I thought that the agreement was you were going to let us have the horses for 30 days. Here it is only the third day and you want money already. How come?"

Plaintiff asked him if he was afraid about the horses, and he said, "No," the only thing was he needed some money; whereupon plaintiff paid him $100 so that defendant had plaintiff's old horse and the $100. Right after July 4th plaintiff went to defendant's place and gave him the rest of the money.

At that time, speaking about Doc, plaintiff claims he said:

"Mr. Goldstein, there must be something wrong with this one horse.  *  *  *  One stands still when you say 'whoa.' The other one fidgets around."

That defendant said:

"That is nothing to worry about.  *  *  *  They got a different place. Now that is why they fidget around. If you keep on working with them for 10 days or 2 weeks he will cool down and you won't have no trouble with him at all."

There was further competent testimony from which the jury could find that on July 18th plaintiff and his wife were in their field hauling hay, having started about 10:30 or 11 a.m., the wife on the hay wagon and plaintiff on the ground ahead of the team; that the bit dropped from out of the mouth of Jerry, the horse about which complaint is not made, and plaintiff approached to replace the bit. As he approached the team he noticed Doc (the horse claimed to be half-gelt) and thought something was wrong with him because his head was erect and his eyes were rolling around. Plaintiff went up to Doc, got him by the bit, tried to quiet him down and had just gotten hold of him when the horse "raised up on his hind legs." That is all plaintiff remembers until he regained consciousness. The team started suddenly and the wagon and horses pulled away. When plaintiff's wife got out of the wagon plaintiff was a few feet away lying on the ground, apparently unconscious; assistance was obtained, plaintiff regained consciousness, was helped into an automobile and taken to the hospital. The team had run out of the hay field, down the

road, and was stopped by a tree on the main highway about half a mile from the hay field. At the hospital plaintiff was treated by Dr. Flanagan, who found a fracture of the acromion process of the right shoulder, dislocation of the right shoulder, fracture of the second, third and fourth ribs, multiple lacerations and bruises over the entire upper thoracic region, multiple lacerations in the mid forehead region, hematoma and shock. The doctor reduced the fracture and dislocation, strapped the ribs and gave plaintiff a hypodermic injection to relieve the pain. Plaintiff was in considerable pain and shock and the doctor saw him twice. Until he was discharged from the hospital on July 25th or 26th he had pain in the chest and it was hard for him to breathe. He had not entirely recovered on leaving the hospital and was expected to stay in bed, and he still had difficulty in breathing. There was also testimony that at the time of the trial, almost 10 months after the injury, plaintiff's ribs still hurt him and if he lifted anything heavy or if he pressed something against his body, "It seems  *  *  * that something is wrong in there;" that at the time of the trial his right arm goes dead when he has to squeeze like in milking—the hand goes to sleep—there is no feeling in it and he rubs circulation back into it and if he coughed or took a deep breath his ribs bothered him.

There is further testimony in the case about the stock on the farm. Plaintiff had 15 milch cows and 19 young stock prior to the injury, had planted and had under cultivation 13 acres of oats, 11 acres of corn, 3 acres of potatoes and 30 acres of hay. After the injury he couldn't do the farm work himself and couldn't hire adequate help with the result that most of the crops were lost. Because of plaintiff's injuries and inability to raise feed for his cows he

had to sell part of them. Before the accident he received an average of $80 every 2 weeks for milk but after the accident he was compelled to sell part of his herd and the milk check dropped to $50, a loss of $30 every 2 weeks.

Dr. Sanders, a veterinary of 32 years' experience, examined the horse Doc and testified that he found him to be a male horse with one testicle. Other veterinaries disputed that statement, leaving a contradiction in the testimony for the jury to decide. It seems to be assumed in this case that it is a matter of common knowledge among persons who use horses that a half-gelt is more fractious than an ordinary work horse. Defendant testified that a ridgeling (meaning half-gelt) is worse than a stallion. It is a matter of common knowledge among persons who handle horses that stallions are, in general, more fractious and unruly than ordinary work horses. It is plaintiff's claim that the horse called Doc was an inherently dangerous animal. There was competent testimony to support the claim that that horse was of unruly temper.

It must be considered that the jury found the warranty and breach thereof claimed by plaintiff. There was competent testimony on which they could base such finding. The verdict was general. There was testimony from which the jury could have found that there was no acceptance after trial of the horse and that there was additional time after the payments were made in which plaintiff was entitled to further try out the horse before final acceptance, and that plaintiff relied on the skill and judgment of defendant in considering the nature of the horses as to gentleness and tractability. 2 Comp. Laws 1929, §§ 9451, 9454 (Stat. Ann. §§ 19.252, 19.255). There was no testimony in the case to indicate that plaintiff was guilty of any ill conduct

which caused the fractiousness of the horse called Doc on the occasion in question. There is further nothing to indicate that the verdict was punitive. The trial judge in requiring the remittitur of $1,000 as the alternative to granting a new trial indicated that he based the reduction mainly upon damages claimed as to crops.

Defendant is not in a position to complain of the required remittitur. There is nothing in this record by which we could assume there was more than $1,000 included in the verdict by the jury on account of loss by reason of failure of crops. The jury could have been justified under the showing made in awarding $2,500 damages without reference to crops at all.

Defendant claims that the damages were not within the contemplation of the parties when making the contract of warranty. Plaintiff cites *Bahlman* v. *Hudson Motor Car Co.,* 290 Mich. 683 (7 N. C. C. A. [N. S.] 790), where we say, quoting from the syllabus, p. 684:

"In action for damages resulting from manufacturer's breach of express warranty, damages are not assessed under the usual rule of the difference between the value of the article as sold and its value had the warranty been true, but plaintiff is entitled to recover for personal injuries proximately resulting from the breach."

See, also, *Curby* v. *Mastenbrook,* 288 Mich. 676, in which damages were allowed for personal injuries sustained because of defective condition of an automobile, there having been a warranty of good condition when the sale was made.

In the instant case there was competent evidence to sustain the verdict, as reduced by the remittitur,

and we do not find that such verdict is against the weight of the evidence.

The judgment for plaintiff is affirmed. Costs to plaintiff.

NORTH, BUTZEL, SHARPE, and BOYLES, JJ., concurred with REID, J.

WIEST, J. (*concurring in result*). I concur in the result.

Plaintiff, a farmer, wanted a well-dispositioned horse and stated his want to defendant who represented to him that he had such a horse. On such representation, which under the circumstances constituted an express warranty, plaintiff purchased the horse. The horse was a vicious brute and in ordinary farm use jumped upon and inflicted severe personal injuries upon plaintiff. Damages for such personal injuries flowed from defendant's wrongful inducement to the purchase and use of the horse by plaintiff.

STARR, C. J., and BUSHNELL, J., concurred with WIEST, J.